Good morning. May it please the Court, I'm Mark Zilversmith. For Petitioner Daniel Cohen, I would like to reserve two minutes for rebuttal. This case is an extreme malfunction in the state criminal justice system. It's also a case per Strickland where counsel's conduct undermined the proper functioning of the adversarial system such that it cannot be relied upon as having produced a just result. It's also a case of a malfunction in the district court. Here, the Attorney General and the state courts agree that the record shows that Daniel Cohen and his mother suffered from delusions and delusionally believed that the neighbors below them had an imaginary methamphetamine lab How is that relevant to the murder? I understand that they thought that they had this delusion about the meth labs. But the murder was of the landlord.  The problem, they were apparently being evicted. So what does the delusion about the meth labs have to do with it? Well, the state's theory of the case, the argument of the prosecutor at trial, who was familiar with the record, was that their delusions that were severe about this methamphetamine lab that did not exist, being below them and that they believed was killing them, was the cause of the murder. Because they believed that Mr. Smith was not protecting them from the meth fumes and they believed that Mr. Smith's eviction was going to kill Daniel's mother, Diana, and she was already very ill and she had a colostomy bag already. So it was directly related to the murder. This was all based upon this delusion that they were being poisoned by these non-existent methamphetamine labs and that they had to act to save Diana. The AG and the state courts agree that they believe that Mr. Smith was responsible and they agree that they delusionally believed that this methamphetamine and the addiction, the eviction, was going to kill Diana. They also agree that the trial counsel pursued what is described as an unsound, legally flawed defense. And they have no answer for this court's decision in Daniels v. Woodford, where the court said prejudice is normally shown when counsel pursues a weak, or in this case, unsound, legally flawed, invalid defense. What are we to do with, you know, obviously we're under AEDPA. We're under AEDPA. Which imposes some limitations in our review. Yes. What was put before the state court appears to be a set of records sort of unaccompanied by any declaration from an expert or from trial counsel. Is that true? That is, no, I put my declaration there. So that's another breakdown in the state process under D-2. Well, you're correct. Right. So the question, I guess, is, you know, on what basis would we say the state court was unreasonable given that what was in front of it, we don't have a reasoned decision, of course, by the state court, so we're hypothesizing as to reasonable means by which it could have denied this. But when all that's put in front of it is a sort of set of records, why would it have been unreasonable to deny it on that basis? Well, we're hypothesizing, and I haven't heard a sound hypothesis for a sound basis, for a reasonable basis for denying it. Particularly because the state, there was evidence in the record that everybody agrees that my client's delusional. There's also evidence in the record that at least one Social Security examiner found him mentally disabled. And the second one didn't. The second one said he improved. But if you read, I put in some articles that explain the shared delusional. In the absence, the state court denied me expert funds. They denied me the ability to present an expert declaration. But did you have an entitlement to that? I mean, I understand that you wanted that, but was there a requirement that that be provided? Well, they're supposed to when you make a prima facie case of a need for an expert and a prima facie case for a need for an evidentiary hearing. You say that as a matter of state law, or is there some other source for this? Well, that's the way the state habeas law works. In Duval, the court said when you make a prima facie showing, you get an evidentiary hearing, and you have the right to experts to make that showing. But this, we have a breakdown here where the trial counsel abandoned a mental health offense. We don't have any dispute that mental health defenses exist to negate malice and premeditation, and also that there's an insanity defense. And one of the articles that I provided the court was about a successful shared delusional disorder, insanity defense. What does the shared nature of this? I mean, I'm asking because I don't understand it. You put a lot of emphasis on this folly adieu. Yes. What difference does it make if two of them had the delusion or one of them had the delusion? Well, the way that the shared delusional disorder, as I as a lawyer and not as an expert understand it, is that there's one dominant, it's called the impose, one dominant person, in this case the mother who's bonkers, to use a non-technical term, and when you have a close relation who's also predisposed to mental illness, they get caught up in this delusion and they follow along. So what Mr. Cohen is doing is he's following along with his mother's delusion, saying you've got to kill this man because it's going to kill me if you don't. And that's how this negates malice, and that's how this is a valid insanity defense, and that's how it denates premeditation, because he's caught up in his mother's delusion. She's dying, apparently, and they blame it on the meth fumes and they run the shower all night long. There's a lot of planning involved in delusional disorders. Like running the shower all the time is a planning method, but it's delusional planning. So this is all delusional planning based on a faulty perception of reality. So it would be better if we had an expert, and I asked the state courts to give me one, and Mr. Cohen, pro per, asked for a hearing and an expert in counsel, and the district court denied it, I think is another flaw. So in, like, Velazquez, which I submitted in the 28J letter, what the court found the proper remedy was was to remand it to the district court. Now, in that case, there were fingerprints that could have supported his theory, but they didn't have the expert, and the court remanded it. One thing Judge Tiger said on this point was that the Supreme Court hadn't clearly established a right to a mental health expert in the state collateral review proceedings. Do you contest that? Well, that's not one of my points on review, and you didn't give me a certificate on that because that's ACA v. Oklahoma, which says you have the right at trial court. What I'm arguing is under D-2, and I think, you know, I've read your opinions, Your Honors, and I've read your dissents from denials on bonbons, and I think, you know, you take this bar seriously, as do I. But I think in your dissent in Kip v. Davis, which was written by Judge Ikuda, and you both signed on to it, you recognize that there are situations under Taylor v. Maddox where there's a central issue, a material issue, that the state court refuses to let be developed, and that's what happened in this case. I agree with you that there's a high bar, and I agree with you in comedy to the state courts, but there has to be some reasonable investigation. So just technically speaking, you're arguing that this would be a D-2 case. Yes. Because of the, in large part, because of the inadequacy of the state court proceeding. Right. Then we get to E-2 and the recent Ramirez decision, which I must say baffles me. And so then the question becomes how, under Cullen v. Pinholster, are you still bound by the state court record, or could you get a federal hearing? You can get a hearing. The D-2 and the E-2 are closely related, the Supreme Court says, but they're not, they haven't defined them. And, you know, there's no question that I was diligent in seeking a hearing. There's no question I was diligent in seeking an expert appointment. So when the state court actively frustrates defense counsel and shuts out this, I mean that exacerbates the inadequacy of the counsel. The counsel was not only inadequate, then he stopped cooperating with me as his duty was as appellate counsel, and then the state courts refused to let me show what he should have done in the first place. And I've done the best that I can by providing this court and that court with articles explaining the sheer delusional disorder. Were you appointed counsel in the district court here? The judge refused to appoint counsel, Your Honor. And he refused to hold a hearing, and he refused to order an expert. And, you know, that's an irony of this case because I think if Judge Tiger had appointed a counsel and counsel had made this D-2 argument clearly, which Judge Tiger did not even address in his order, I think there's a reasonable probability that Judge Tiger would have granted a hearing and would have granted an expert and would have granted the petition. But because it was all done with the pro per defendant, you know, the articles were not made as clearly as a lawyer might have made. And Judge Tiger held no oral argument, of course. And, you know, that's another irony. So I think it's also a breakdown in the district court, and I think one proper remedy is to do what the court did in Velazquez, which is to remand with a to at least consider ordering an evidentiary hearing and appointment of counsel. Okay, and I think we've let you go all of your time. Oh, I appreciate your indulgence, Your Honor. Well, we will put two minutes on the clock for rebuttal, so we'll see you again shortly. Thank you, Your Honor. We'll hear from your opposing counsel. Thank you. Good morning. Jill Thayer for the respondent. I'll start off with one of the questions about the delusion. And the delusion about the methamphetamine, whatever the delusions were, none of them had to do with a delusion that Mr. Smith posed an imminent threat to Mr. Cohen or his mother. And that's where this begins and ends. There's no that wasn't what the delusion was. And so there's other cases that Mr. Cohen has cited about where the person has a delusion that this person is attacking them or attacking them with a weapon or something like that. But that's not here. And I know this Court is familiar with the horrifying facts of premeditation in this case and planning because Mr. Cohen and his mother were very capable of planning and premeditation and deliberation. And whatever their delusion was, it certainly didn't prevent them from a day-long activities in killing Mr. Smith. So I just want to point that out. Also, the lack of declarations here is fatal to his claim. And whatever the AG admits or doesn't admit, and I'm not saying I admit to anything that opposing counsel has said, but what really matters is whether the State court decision was objectively unreasonable. And it just wasn't here in the facts of this case. That's all this Court has to look at. Is there no set of facts that could have been developed that would have provided a mental health-related defense here? Essentially, I mean, I gather that there wasn't enough investigation in the trial court that this one doctor said he didn't think there was an insanity defense, but he needed the medical records and he didn't get them, right? Well, it sounds like, although it's very difficult to tell from these declarations, and they're all hearsay, but that they decided, and Dr. Dondershine was a very experienced psychiatrist. And so after the conversation, supposedly, they decided not to pursue an insanity defense. And really, insanity was the way to go here, but there wasn't an insanity defense here. You're saying they couldn't negate premeditation because there was all kinds of evidence of premeditation. So much evidence of premeditation. Absolutely. So if, in fact, Mr. Cohn believed that the victim was kind of a—I guess there was no evidence of this— a demon or something who was causing his mother's death, but not right away, that there would be no defense under California law to malice or premeditation or anything? That might be an insanity defense. I've seen people try and argue that, and sometimes it works and sometimes it doesn't. But, again, that would be insanity. That would be the person thought they were killing a demon. But that's not what happened here, obviously. I have a hard time imagining, with this set of facts, anything that would get rid of the evidence of planning premed— and obviously intent to kill, too. I mean, he shot him four times, twice in the head, once in the chest. Isn't Cohn's theory that all of this, what he would like to try to argue, is that all of this was under this cloud of delusion? Is that inconsistent with what you're saying here? I mean, that all of this could have happened under this shared psychosis that he had with his mother. I don't understand how that could possibly be a defense based on lack of the required mental state here. You're saying even if that's all true, there's no defense? Insanity. The defense to pursue here would be insanity. And Mr. Page did pursue that, and he asked Dr. Dondershine to look at that. And they decided that no. And, of course, there was a lot of— And no because the evidence of premeditation and intent to kill belied the theory that he was acting under some compulsion at the time? Is that what you're saying? Well, clearly he knew right from wrong because they were hiding all their—they went through all this machinations to borrow a car and hide the weapon and so forth. So obviously they knew they should not be killing this person. So a jury's not going to believe insanity. Insanity is—these people were not mentally healthy. Yes. But insanity is very difficult to prove, legal insanity. And they just didn't have that— And this evidence would not be relevant to some other type of defense? I'm sorry. Not insanity, but some other form of defense that's available. I think Mr. Page was very reasonable to say that a jury is not going to buy this evidence, and it doesn't show, on the facts of this case, a lack of intent to kill or a lack of premeditation and deliberation. There are so many examples in the records of all these cases of showing, you know, unreasonable self-defense or whatever. But that's not what happened here. Mr. Smith was sitting in his office by himself. He was a sitting duck. He did not pose an imminent threat. Did all the delusional history come out at trial? I assume it did. There was evidence of—the neighbors testified and so forth, yes. In support of the imperfect self-defense theory, or in support of what theory? Well, it was—it was—a lot of it was to show the motive. Like, why did they do this? And it looked like it was to show, you know, how they came to find that it was, indeed, Mr. Cohen and the mother. Like, it came— But it was government evidence, right? It was prosecutorial evidence. The evidence came from the prosecution. Right. To show the sad series of events that led up to this. Just because I'm curious, what's happened to the mother? I don't know. And I looked it up—well, I didn't look it up recently. I did not see anything about a habeas petition, at least a federal habeas petition. So I don't know. I didn't look it up just before this argument, but— Let me see if my colleagues have further questions for you. I don't. I mean, it's a troubling situation, but I—well, I do have one. The district court held that there was ineffective assistance, and you spend a lot of your brief arguing with that. Is there any reason we should get to that question? Well, I think just for Mr. Page's sake, I think he performed competently. Certainly under Strickland, this Court could go straight to prejudice and say no prejudice, because it's so overwhelmingly obvious that there's no prejudice here. I think Mr. Page, and also he could have reasonably seen— And essentially there's no prejudice because there's no viable theory. There's no viable theory. Which this would have mattered. And what's, of course, very tricky about these prejudices, certainly Mr. Page could have also realized there's no viable theory here, and that's why he didn't go into the—and I don't know how to pronounce it, but the— Whatever, the Foley.  Yeah, that. So, and he could have thought, no jury's going to buy this, and so on and so forth. What was the nature of Mr. Page's defense then at trial? Well, and I did expect—he did the best he could with what he could. I mean, I think he did try and glean some sympathy and explain this weird relationship that Mr. Cohen had with his mother, and sometimes that's the best you can do. The facts were horrible. He walked into his office with these facts, and he did what he could with what he had. Okay. Thank you very much. Okay. Thank you. I'll submit. Thank you, Your Honors. Well, I disagree, of course. So, in McShane, which I cited in my reply brief, this court talks about what you can do with mental illness to negate malice and premeditation, and you also talk about this in Daniels, which is a much older case, but also— It would be helpful to me if you were very specific about what the defense could have been. The defense could have been, based on a shared delusional disorder, Mr. Cohen's mental state was fused with his mother's, and therefore he did not actually premeditate, and he did not actually form the mental state of malice. And that is a valid defense, and also that he understood— No. So therefore— —misunderstood imminence. Wait. So this is interesting. So the hallucinations don't actually matter. What matters is that he would just do whatever his mother said? Well, that's no. I don't think — well, partly and partly no. I think the delusions matter, because they show how much control Mr. — Mrs. Cohen exerted over Mr. Cohen, because they show when the neighbor testified, and this was all introduced by the prosecutor to show the motive. The neighbor testified, I don't make methamphetamine. I invited him into my house to show him that there's no meth lab down there, and the mother kept telling him, look in the cupboards, look in the sink, look down in the shower. And he said, look in the stove. Every time he came out of that apartment and said, it's not there, Mom, it's not there, she kept telling him to look other places. And then when she said, I've looked everywhere, Mom, and it's not there. And she says, well, she's got a kid, and her kid and her friends go in and out of that place with backpacks. So they're taking the methamphetamine equipment in and out of the house with backpacks. And he's still believing her ridiculous, delusional worldview. So he's very much under her thumb, and the prosecutor said that. And so that's part of it. And if you look at the Humphreys case in California, that's a battered woman syndrome. And battered women are very sympathetic, and they have the right to use force against their abusers. But if a battered woman in the Humphrey case killed her batterer in bed under the belief that he was going to wake up any minute and kill her, that's a valid defense in California, even though the man is sleeping. He's not an imminent threat under, you know, if we saw him in this courtroom, we would say he's not an imminent threat. But she's been battered so much that her mental state, and that's what CalCrim 342. Let's go a little bit over, Mr. Zilbersmith. Let me see if my colleagues have other questions for you this morning. Well, again, because I'm curious, do you know what happened to the mother? Excuse me? Because I'm curious, do you know what happened to the mother? The mother is in prison. Well, I'm sorry. Well, they both got life without parole. And last time I checked, she was alive. My client, separated from his mother, is now doing much better, but he has no chance of parole under the court's rulings. And, you know, as far as I can tell, his attorneys did not pursue the defenses that I did, which is too bad, but I can't be everybody's lawyer. Okay. Well, thank you very much for your presentation this morning. I appreciate the court's time. Thank you. We thank both you and Ms. Thayer for the presentations. This matter is submitted. Thank you, Your Honors.
judges: BERZON, BRESS, VANDYKE